IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHERIF el-MASHAD, et al. | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) Civil Action No. 1:05-CV-270 (JR) |
| | ) |
| GEORGE W. BUSH, et al., | ) |
| | ) |
| Respondents. | ) |
| | ) |

**RESPONDENTS' MOTION FOR PARTIAL
MODIFICATION OF THE COURT'S APRIL 7, 2005 ORDER**

Respondents hereby move to modify the Court's April 7, 2005 Order (dkt. no. 29) in

order to enable respondents to proceed with the repatriation of petitioner Adel Fattouh Aly

Ahmed Algazzar.

**BACKGROUND**

**A.      Procedural History**

Petitioner is an alien who was taken into custody in connection with the military conflict

in Afghanistan between the United States and the Taliban and al Qaeda.  A Combatant Status

Review Tribunal has determined that petitioner is an enemy combatant, and the Department of

Defense is detaining petitioner at the Guantanamo Bay Naval Base.  On or about February 4,

2005, petitioner filed the instant petition for a writ of habeas corpus (dkt. no. 1).  Simultaneous

with filing the petition, petitioner moved for a preliminary injunction forbidding respondents

from transferring or releasing petitioner – thus, effectively requiring that the United States

continue to detain him at Guantanamo – for the duration of this action (dkt. no. 3).  Respondents

opposed that motion.  Respondents also moved to stay proceedings in this case pending appeals

of other Guantanamo detainee habeas cases that would address key legal issues (dkt. no. 16).

On April 7, 2005, the Court issued an order on various pending motions (dkt. no. 29). The Court granted respondents' motion to stay proceedings.  Although the Order stated that "Petitioners' motion for a preliminary injunction [3] is denied," a provision was incorporated into the stay that "Petitioners having submitted themselves to the jurisdiction of this Court, and the Court having asserted in personam jurisdiction, see Rasul v. Bush, 124 S. Ct. 2686 (2004), the stay will apply to all proceedings applicable to the petitioners, including without limitation their release, repatriation, or rendition, and it will remain in effect until further order of the Court" (emphasis added).[1]

## B.     United States Policies on Practices and Repatriations

Although the laws of war permit the United States to hold enemy combatants in detention for the duration of hostilities, as respondents have previously informed the Court, the United States has no interest in detaining any individuals longer than necessary.  See Declaration of Dep'y Asst. Sec'y of Defense for Detainee Affairs Matthew C. Waxman dated October 14, 2005

---

[1] On June 2, 2005, respondents filed a notice of appeal from the portion of the Court's April 7, 2005 Order that prohibits the transfer or release of petitioners from Guantanamo (dkt. no. 33).  See el-Mashad v. Bush, D.C. Cir. No. 05-5246.  Petitioners have moved to dismiss that appeal for alleged lack of subject matter jurisdiction, which respondents have opposed.  In any event, the pendency of the appeal does not oust this Court of jurisdiction to modify its order.  Cf. Stone v. INS, 514 U.S. 386, 401 (1995) ("the pendency of an appeal does not affect the district court's power to grant Rule 60 relief"); Jefferson v. Department of Justice, 2004 WL 722274, at *1 (D.C. Cir. 2004) (unpublished) (same); see also 16 Charles Alan Wright, Arthur R. Miller et al., Federal Practice and Procedure § 3921.2, at 53 (2d ed. 1996) ("Ordinarily an interlocutory injunction appeal under § 1292(a)(1) does not defeat the power of the trial court to proceed further with the case.").

("Waxman Decl.") ¶ 3 (attached hereto as Ex. A);[2] Declaration of then Ambassador Pierre-Richard Prosper dated Feb. 25, 2005 ("Prosper Decl.") ¶ 2 (originally filed in connection with respondents' opposition to petitioners' motion for preliminary injunction, see dkt. no. 13, ex. 2). The Department of Defense ("DoD") has regularly and methodically evaluated whether it should continue to detain each individual in its custody at Guantanamo, and has transferred almost 250 Guantanamo detainees over a period of several years.  Waxman Decl. ¶¶ 2, 3, 4.

While every transfer of a Guantanamo detainee constitutes in the first instance a transfer to the government of the receiving country (generally the detainee's country of nationality), transfers can be divided into two categories.  First, the United States may transfer a detainee to the control of another government with the understanding that, from the United States' perspective, he can be released.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  Second, the United States may transfer a detainee to the control of another government for continued detention, investigation, and/or possible prosecution when the receiving government is willing to accept responsibility for ensuring, consistent with its laws, that the detainee will not pose a threat to the United States and its allies.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  Each type of transfer reflects United States policy not to hold those determined to be enemy combatants longer than necessary, as well as to promote the vital cooperation and participation of other concerned governments in the global war on terrorism.  Waxman Decl. ¶¶ 3, 8; Prosper Decl. ¶¶ 2, 12.

Transfers to the control of other governments for continued detention, investigation,

---

[2] The policies and practices of the Department of Defense regarding transfers and repatriations of Guantanamo detainees as set forth in the Waxman Declaration attached hereto as Exhibit A are the same as described in previous declarations of Deputy Assistant Secretary Waxman filed in this case on February 25, 2005 (dkt. no. 13; ex. 3), and July 11, 2005 (dkt. no. 34), respectively.

and/or prosecution occur after a dialogue between the United States and the receiving government, which may have been initiated by either the United States or the receiving government. Waxman Decl. ¶ 5. The purpose of such dialogue is to ascertain or establish what measures the receiving government intends to take, pursuant to its own domestic laws and determinations, that will ensure that the detainee will not pose a continuing threat to the United States and its allies. Id. In all cases where a transfer is consummated, the detainee is transferred entirely to the custody and control of the other government; once transferred, the individual is no longer in the custody or control of the United States. Id. Any future detention of that individual is by the foreign government pursuant to its own laws and not on behalf of the United States. Id.

In any transfer, a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations. Prosper Decl. ¶ 4; Waxman Decl. ¶ 6-7. It is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured. Prosper Decl. ¶ 4; Waxman Decl. ¶ 6. If a transfer is deemed appropriate, a process is undertaken, typically involving the Department of State, in which appropriate assurances regarding the detainee's treatment are sought from the country to whom the transfer of the detainee is proposed. Waxman Decl. ¶ 6; Prosper Decl. ¶ 5. Once the Department of Defense approves a transfer and requests the assistance of the Department of State, the Department of State initiates transfer discussions with the relevant foreign government. Waxman Decl. ¶ 6; Prosper Decl. ¶ 6. Such discussions include an effort to obtain assurances that the United States Government considers necessary and appropriate for the country in question, including assurances of humane treatment and treatment in accordance with the international obligations of

4

the foreign government accepting transfer.  Id.  Among other things, the Department of State

considers whether the nation in question is a party to relevant treaties such as the Convention

Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursues

more specific assurances if the nation concerned is not a party or other circumstances warrant.

Id.

The determination whether it is more likely than not an individual would be tortured by a

receiving foreign government – including, where applicable, evaluation of foreign government

assurances – involves senior level officials and may take into account a number of

considerations, including whether the nation concerned is a party to certain treaties; the expressed

commitments of officials of the foreign government accepting transfer; the particular

circumstances of the transfer, the country, and the individual concerned; and any concerns

regarding torture that may arise.  Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7.  The Department of

State develops its recommendations through a process involving the Bureau of Democracy,

Human Rights, and Labor (which drafts the Department of State's annual Country Reports on

Human Rights Practices) and the relevant Department of State regional bureau, country desk, or

U.S. Embassy.  Prosper Decl. ¶ 7.[3]  When evaluating the adequacy of assurances, Department of

---

[3] It is important to note that the Country Reports on Human Rights Practices are relevant but not necessarily dispositive in assessing whether it is more likely than not that a particular individual faces a likelihood that he will be tortured by a receiving foreign government.  For example, the Country Reports may describe problems that are confined to a particular facility or component of a government, may reflect certain types of fact patterns that are not applicable to the situation at hand, or may raise concerns that can be appropriately addressed through assurances from the receiving government and, in appropriate cases, monitoring mechanisms.  Thus, the fact that a Country Report on Human Rights Practices discusses issues with respect to a country does not per se make that country forever off-limits as a potential repatriation or transfer destination.

State officials consider the identity, position, or other information concerning the official relaying the assurances; political or legal developments in the foreign country concerned that provide context for the assurances; and the foreign government's incentives and capacity to fulfill its assurances to the United States.[4]  Prosper Decl. ¶ 8.  In an appropriate case, the Department of State may consider various monitoring mechanisms for verifying that assurances are being honored.  Id.  If a case were to arise in which the assurances obtained from the receiving government were not sufficient when balanced against treatment concerns, the United States would not transfer a detainee to the control of that government unless the concerns were satisfactorily resolved.  Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.  Indeed, circumstances have arisen in the past where the Department of Defense decided not to transfer detainees to their country of origin because of mistreatment concerns.  Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.

## C.  Repatriation of Petitioner Adel Fattouh Aly Ahmed Algazzar

Respondents intend to release petitioner Adel Fattouh Aly Ahmed Algazzar from the custody of the United States and to repatriate him to his home country of Egypt.  Specifically,

---

[4] Diplomatic sensitivities surround the Department of State's communications with foreign governments concerning assurances relating to torture, and the United States' ability to seek and obtain assurances from a foreign government depends on its ability to treat its dealings with the foreign government with discretion.  Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.  The United States Government typically does not unilaterally make public any specific assurances or other precautionary measures obtained, because such disclosure would have a chilling effect on and cause damage to our ability to conduct foreign relations.  Prosper Decl. ¶ 9.  Disclosure of communications with a foreign government relating to particular mistreatment or torture concerns outside appropriate Executive Branch channels may cause that government and potentially other governments to be reluctant to communicate frankly with the United States concerning such issues in the future.  Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8.  As a result, disclosure could impede our country's ability to obtain vital cooperation from concerned governments with respect to military, law enforcement, and intelligence efforts related to the war on terrorism.  Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

petitioner Algazzar will be transferred to the control of his home government for continued

detention, investigation, and/or prosecution as that country deems appropriate.  This transfer has

been arranged and will be effected consistent with the policies and practices set forth above, as

described in the Declarations of Deputy Assistant Secretary Waxman and Ambassador Prosper.

<u>See</u> Waxman Decl. ¶ 9.  Respondents reiterate that those policies and practices include the policy

of the United States not to engage in any repatriations or transfers of detainees in circumstances

where the United States believes, based on consideration of all the factors, it is more likely than

not that the individual will be tortured.  <u>See</u>, <u>e.g.</u>, Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.

## <u>ARGUMENT</u>

The Court's Order of April 7, 2005 should be modified in order to permit the United

States to proceed with the repatriation of petitioner Algazzar.  Just as the United States has an

undeniable interest in detaining enemy combatants to prevent them from returning to the

battlefield, so too the United States has a compelling interest in not serving indefinitely as the

world's jailer in circumstances where detainees' home countries are ready and willing to take

responsibility for them in accordance with their own laws, and in being able to repatriate or

transfer detainees when continued detention by the United States is no longer militarily necessary

or appropriate.  Indeed, vital to the global war on terrorism is the United States' ability to obtain

the cooperation and participation of other countries in taking responsibility for their own

nationals who are part of or support enemy forces.  <u>See</u> Waxman Decl. ¶ 8; Prosper Decl. ¶ 4.

Neither the fact that petitioner has invoked the jurisdiction of the Court by filing a habeas

petition, nor the pendency of appeals in Guantanamo detainee cases raising key legal issues,

justifies prohibiting petitioner's release from United States custody.  It would be ironic, given

that "[t]he ultimate objective of a habeas petition is release from custody," if the filing of a

habeas case were deemed to require that the Executive maintain custody that it would otherwise

relinquish.  Almurbati v. Bush, 366 F. Supp. 2d 72, 78 (D.D.C. 2005).  "[O]nce the respondents

release the petitioners from United States custody . . . they will have obtained the result requested

[through habeas] and at that point there will be no further need for this Court to maintain

jurisdiction."  Id. at 80; see also Al-Anazi v. Bush, 370 F. Supp. 2d 188, 198 (D.D.C. 2005)

("Every habeas petition, including this one, is ultimately about obtaining release from detention,

and where, as here, the United States will relinquish custody of the detainee to the home

government there is nothing more the Court could provide to petitioners." (citation omitted)).  To

treat the simple fact of pendency of a habeas corpus petition as a sufficient basis for barring a

release from United States custody would turn the meaning of habeas corpus on its head and

unjustifiably entitle alien enemy combatants to the equivalent of an automatic injunction

(irrespective of whether the usual standards for injunctive relief are satisfied) through the

unilateral act of filing a petition.  Cf. O.K. v. Bush, 377 F. Supp. 2d 102, 117 (D.D.C. 2005)

(rejecting interpretation that would transform a specific rule of appellate procedure "into a

sweeping prohibition on the transfer and release of military detainees").

Moreover, a bar against repatriation cannot be justified by the fact that respondents are

aware that the sovereign government of petitioner's home country intends to take measures

pursuant to its own domestic laws and determinations, such as further detention, investigation,

and/or prosecution, as appropriate, that will ensure petitioner does not present a future threat to

the security of the United States.  When the Department of Defense transfers a detainee to the

control of another government, the detainee is no longer subject to the custody or control of the

United States, and any subsequent confinement in the receiving country is based on the receiving government's decision, based on its domestic laws and interests, that the individual should be detained.  Waxman Decl. ¶¶ 5, 9.  Indeed, the lack of control by the United States is exemplified by the fact that, should the home government subsequently determine to release a transferred detainee, the United States would not be in a position to prevent it from doing so.  "This Court has no authority to prevent a foreign sovereign from pursuing an independent law enforcement action against a detainee, or to order the United States to transfer a detainee to the country of his choosing."  Al-Anazi v. Bush, 370 F. Supp. 2d 188, 198 n.10 (D.D.C. 2005).

The Court's April 7, 2005 Order as currently framed, however, stands in the way of the planned repatriation of petitioner insofar as the stay that the Court entered includes a bar to the repatriation of the petitioners.  Thus, respondents ask that the Court partially modify its April 7, 2005 Order to the limited extent necessary to permit the planned repatriation of petitioner Algazzar to be effected.  Without waiving any objections or appellate contentions as to the application of the April 7, 2005 Order's bar on transfer or repatriation to the other petitioner in this case, respondents do not seek any other modification of the Order at this time.

## CONCLUSION

Respondents respectfully request that the Court modify its April 7, 2005 Order to the extent necessary to enable respondents to proceed with the repatriation of petitioner Adel Fattouh Aly Ahmed Algazzar.

Dated: October 17, 2005                                Respectfully submitted,

                                                       PETER D. KEISLER
                                                       Assistant Attorney General

9

KENNETH L. WAINSTEIN
United States Attorney

DOUGLAS N. LETTER
Terrorism Litigation Counsel


　　/s/ Robert J. Katerberg　　　　　　　　
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ
PREEYA M. NORONHA
ROBERT J. KATERBERG
ANDREW I. WARDEN
NICHOLAS J. PATTERSON
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 616-8298
Fax:  (202) 616-8460

Attorneys for Respondents